*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0137P (6th Cir.)
File Name: 04a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellee,*

　　　*v.*

ANTHONY DEJOHN (02-3158);
CHRISTOPHER HARB
(02-3175),
　　　*Defendants-Appellants.*

Nos. 02-3158/3175

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-00516—Kathleen McDonald O'Malley, District
Judge.

Argued: January 28, 2004

Decided and Filed: May 13, 2004

Before: MARTIN, RYAN, and MOORE, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Michael J. Benza, Cleveland, Ohio, Thomas J. Broschak, ULMER & BERNE, Columbus, Ohio, for Appellants. Ronald B. Bakeman, ASSISTANT UNITED

STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Michael J. Benza, Cleveland, Ohio, Thomas J. Broschak, ULMER & BERNE, Columbus, Ohio, for Appellants. Ronald B. Bakeman, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court, in which MARTIN, J., joined. RYAN, J. (p. 24), delivered a separate concurring opinion.

———————

## OPINION

———————

KAREN NELSON MOORE, Circuit Judge. Codefendants Christopher Harb and Anthony DeJohn appeal from their convictions and sentences for conspiracy to distribute cocaine, conspiracy to distribute marijuana, and unlawful use of a communication facility (Harb); and conspiracy to distribute marijuana, possession of marijuana with intent to distribute, unlawful use of a communication facility, and being a felon in possession of a firearm (DeJohn). They each raise numerous assignments of error, of which the two most novel and meritorious are a shared claim of Speedy Trial Act error and DeJohn's argument that a specific unanimity instruction was required for his felon-in-possession charge, which involved two different firearms. Nonetheless, because we ascertain no violation of the Speedy Trial Act and because we conclude that the specific firearm possessed by a felon is not an element of the crime defined by 18 U.S.C. § 922(g)(1) requiring jury unanimity, we **AFFIRM** the convictions and sentences of Harb and DeJohn.

## I. BACKGROUND

In early 2000, the FBI began an investigation into a cocaine ring in Cleveland's eastern suburbs. After attempts to use undercover agents to pursue suppliers further up the

distribution chain were unsuccessful, a wiretap investigation was pursued which culminated in a tap being placed on Alfred Laudato's ("Laudato") cellular telephone. Laudato was supplying numerous customers in the Cleveland area with cocaine and also with marijuana. Harb sold marijuana to and purchased cocaine from Laudato, while DeJohn purchased marijuana from Laudato. In June 2000, the FBI terminated the investigation, making numerous arrests and searching both Harb's and DeJohn's residences. At DeJohn's residence, drug distribution paraphernalia (plastic bags and a three-beam scale stored together) and eight separate bags of marijuana were found together in a duffel bag. Additionally, two firearms were found, a small handgun along with ammunition in a drawer underneath the couch in the family room, and a Remington 870 shotgun in a bedroom closet upstairs. At Harb's residence, numerous firearms were discovered, totaling three pistols and four rifles, as well as a bag of marijuana. Harb and DeJohn were both indicted with twenty-six other individuals on June 13, 2000, and then arrested as part of the raids on June 14, 2000.[1] Two superseding indictments were filed, one on July 11, 2000, with additional codefendants, and a second superseding indictment on October 3, 2000, which named far fewer conspirators as so many had already pleaded guilty. Harb and DeJohn, however, ultimately refused to plead guilty, and were eventually the only defendants left. The government's motion to dismiss the indictment against them without prejudice was granted on November 13, 2000, and on December 28, 2000, they were reindicted; this later indictment was the first containing the firearms charges against DeJohn.

---

[1]Harb was also implicated in and charged with crimes relating to extortion, for which he was acquitted, which had no effect on his sentencing, and which, for the sake of simplicity, we have omitted from our recounting of the facts.

DeJohn and Harb proceeded to trial on the 34-count indictment on May 7, 2001. At trial, the government's chief witness was Laudato, who had agreed to testify against Harb and DeJohn as part of a plea bargain with the government. The government introduced as well numerous tapes and transcripts obtained through the wiretap on Laudato's phone. Most of the conversations involving drug purchases were in code or otherwise opaque; Laudato "decoded" the conversations for the jury. Both Harb and DeJohn testified in their own defenses. Harb claimed to have purchased cocaine only for personal use in small amounts from Laudato and asserted that his only involvement with marijuana distribution was storing marijuana for Laudato. DeJohn claimed to have purchased marijuana from Laudato only for personal use, despite phone calls entered into evidence, which DeJohn admitted referred to marijuana purchases, in which DeJohn describes "the guys" who want marijuana from him. Joint Appendix ("J.A.") at 628-30. DeJohn also presented testimony from relatives and friends in which they claimed ownership of the two guns found in DeJohn's residence. Each defendant was acquitted of certain charges by the jury, as well as convicted of conspiracy to distribute cocaine, conspiracy to distribute marijuana, and unlawful use of a communication facility (Harb); and conspiracy to distribute marijuana, possession of marijuana with intent to distribute, unlawful use of a communication facility, and being a felon in possession of a firearm (DeJohn).

At sentencing, Harb's total adjusted offense level was twenty-eight.[2] The district court found his base offense level to be twenty-six based on drug quantities, and applied a two-level upward adjustment for obstruction of justice based on

---

[2]Although the Presentence Investigation Reports ("PSRs") for Harb and DeJohn have not been submitted as part of the Joint Appendix, the district court indicated that calculations were initially made using an unspecified year's guidelines, presumably 2000, and rechecked with the 2001 guidelines, which revealed no change.

Harb's perjury at trial. The district court declined to make a downward adjustment for a mitigating role, noting that it had previously limited the government's case to the narrow conspiracies ultimately charged to the defendants. The district court denied an acceptance of responsibility adjustment and a downward departure based on family responsibilities. Harb was sentenced to seventy-eight months' imprisonment.

DeJohn's base offense level for the gun charges was assessed at twenty-four under U.S.S.G. § 2K2.1(a)(2), as he had two prior felony convictions for assault, a crime of violence. Because the firearms charge and the drug charges were unrelated to one another, he received a one-level increase in his offense level under § 3D1.4 for the drug charges. He also received a two-level enhancement for obstruction of justice based on his perjury at trial, making his total adjusted offense level twenty-seven. His criminal history was assessed at Category VI under § 4B1.1 for his two prior assault convictions, which increased both his offense level by ten and his Criminal History Category by three. The district court granted a downward departure because of this dual effect of his two prior assault convictions. The departure was three Criminal History Categories, down to his "original" Criminal History Category of III, i.e., without the Career Offender increase under § 4B1.1. This resulted in a sentencing range of 87 to 108 months; DeJohn was sentenced to 91 months' imprisonment. This timely appeal followed.

## II. ANALYSIS

### A. Speedy Trial Act

"We review the District Court's legal interpretation of the [Speedy Trial Act] de novo and the factual findings supporting its ruling for clear error." *United States v. O'Dell*, 154 F.3d 358, 360 (6th Cir. 1998) (citing *United States v. Carroll*, 26 F.3d 1380, 1390 (6th Cir. 1994)), *cert. denied*, 526 U.S. 1029 (1999).

The Speedy Trial Act ("Act") provides, "Any . . . indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested." 18 U.S.C. § 3161(b). The Act contains two main time limits: the limit in § 3161(b) running from arrest or summons to indictment, and the seventy-day limit in § 3161(c) running from indictment to trial. The purpose of the former, the thirty-day limit at issue in this case, is to insure that individuals will not languish in jail or on bond without being formally indicted on particular charges. In this case, DeJohn and Harb were originally indicted before their arrest, and remained under indictment until November 13, 2000, when the indictment then in force against them was dismissed. No criminal complaint had been filed, and the terms and conditions for release on bail were terminated, leaving DeJohn and Harb without any restriction on their liberty after November 13, 2000, and before their reindictment. DeJohn and Harb were reindicted on December 28, 2000, forty-five countable days after the dismissal of the prior indictment. Their argument that the Act was violated because their reindictment happened too long after the dismissal of the previous indictment is based largely on *United States v. Berry*, 90 F.3d 148 (6th Cir.), *cert. denied*, 519 U.S. 999 (1996), in which this court, in dealing with an analogous situation where only one day passed between dismissal and reindictment, wrote, "When the original indictment was dismissed, the thirty-day period again continued to run; it did not begin anew." *Id.* at 151. Adding together the time that ran on the arrest-to-indictment clock initially (zero days) and that which ran after the dismissal of the original indictment (forty-five days), DeJohn and Harb argue that the thirty-day period expired, requiring the reversal of their convictions.

"The purpose of the thirty-day rule is to ensure that the defendant is not held under an arrest warrant for an excessive period without receiving formal notice of the charge against which he must prepare to defend himself." *Berry*, 90 F.3d at 151. The evil against which the Act is meant to protect is the

extension of the period when the accused is under legal restraint but does not know the charges she will eventually face; where no legal restraint exists, the thirty-day limit is inapplicable. This is borne out by the text of the Act itself, as the remedy for a violation of the thirty-day arrest-to-indictment rule is the dismissal of charges contained in the criminal complaint against the accused. Title 18 U.S.C. § 3162(a)(1) specifies, "If, in the case of any individual against whom a complaint is filed . . . no indictment or information is filed within the time limit required by section 3161(b) . . . such charge against that individual contained in such complaint shall be dismissed or otherwise dropped." In this case, no criminal complaint was ever issued against Harb and DeJohn, as they were indicted before they were arrested; they therefore spent no time under the shadow of a complaint or an arrest warrant without a warning of the charges they would have to prepare to face. Even if we were to find a technical violation of the Act in this case, Harb and DeJohn would have no remedy, as the only remedy for that violation would be dismissal of charges contained in a nonexistent complaint. It seems clear that the thirty-day clock is reset by the dismissal of an outstanding indictment by the government where no further restraint on the accused's freedom remains after that dismissal.[3]

---

[3] Although we believe the cases cited by Judge Ryan in his concurring opinion, holding that only arrest on formal federal charges triggers the thirty-day rule, lend further support to our conclusion, we note that none of them involves an arrest pursuant to an indictment. Because DeJohn and Harb were, in fact, arrested pursuant to federal charges — that is, those contained in the original indictment — we do not believe those cases necessarily control. *See United States v. Blackmon,* 874 F.2d 378, 381 (6th Cir.) ("defendant is not 'arrested' for purposes of the Speedy Trial Act until formal federal charges are pending"), *cert. denied*, 493 U.S. 859 (1989). While we think it is unlikely that any situation will arise where an arrest pursuant to an indictment will implicate the thirty-day rule, especially in light of our holding today, we are nonetheless reluctant to hold that an arrest pursuant to an indictment is not a triggering arrest, where it is unnecessary to do so to dispose of Harb and DeJohn's claim.

In support of their argument that the thirty-day arrest-to-indictment clock continues to run after the dismissal of the indictment in the absence of any other legal restraint on their freedom, Harb and DeJohn rely on a single sentence from *Berry,* which stated, "When the original indictment was dismissed, the thirty-day period again continued to run; it did not begin anew." 90 F.3d at 151. While we think this statement is likely dicta unnecessary to *Berry*'s holding, as the thirty-day period had not yet run in *Berry*, in any event the meaning of *Berry* is clearly contrary to the defendants' position. Even if this sentence were part of the holding of *Berry*, rather than dicta incidental to that holding, it would still be limited by the earlier statement in *Berry* that the "purpose of the thirty-day rule is to ensure that the defendant is not held *under an arrest warrant* for an excessive period." *Id.* (emphasis added). *Berry* can thus be reconciled easily with our holding here: where no arrest warrant or criminal complaint is outstanding, the thirty-day clock does not run.

## B. Jury Unanimity Under *Richardson v. United States*

DeJohn failed to object to the jury instructions regarding his felon-in-possession charge, so we review for plain error the district court's failure to give the instruction now sought by DeJohn. *United States v. Sims*, 975 F.2d 1225, 1240 (6th Cir. 1992), *cert. denied*, 507 U.S. 999 (1993). While DeJohn makes an ineffective-assistance-of-counsel claim with regard to this asserted error, we decline to address his claim of ineffective assistance of counsel on direct appeal, as explained below, and we will review for plain error this claim of error regarding the instructions.

DeJohn argues that because the indictment charged the possession of two different firearms as a single violation of 18 U.S.C. § 922(g)(1), prohibiting the possession of firearms by a felon, he was entitled to a jury instruction stating that the jury must unanimously decide which firearm he possessed. DeJohn points to *Richardson v. United States*, 526 U.S. 813 (1999), in which the Supreme Court held that under the

continuing criminal enterprise statute, 21 U.S.C. § 848(a), each underlying violation was an individual element of the crime, and a unanimity instruction was therefore required. Title 21 U.S.C. § 848 forbids any person from engaging in a "continuing criminal enterprise," which in turn is defined as a violation of the drug statutes that was part of a "continuing series of violations" as further defined in 21 U.S.C. § 848(c). The question for the Court was whether each underlying violation in the series was an element such that unanimity was required as to which violations the defendant had committed. *Richardson*, 526 U.S. at 817-18. In holding that each violation in the series was an element of the continuing criminal enterprise crime, the Court held that the statute in question defined the crime such that each violation was an element of the crime, rather than a means by which the crime is committed, which would not require unanimity. The Court illustrated the difference between element and means by discussing a hypothetical robbery by force or threat of force: while "force" was an element of the crime, the means by which force was brought to bear did not require unanimity, so half the jury could believe a knife was used and the other half a gun without constitutional difficulty. *Id.* at 817. In making its determination, the Court proceeded to look at the language of the statute, tradition, and the breadth of the statute (which "aggravates the dangers of unfairness" of treating each violation as a means, *id.* at 819), and to the desirability of avoiding having to decide the constitutional questions surrounding a definition of a crime that allows significant jury disagreement as to means. The Court also rejected the government's argument that demonstrating each violation would prove too difficult.

Prior to *Richardson*, the only cases in the Sixth Circuit on the subject of jury unanimity with respect to multiple firearms in a single charge dealt with the question of when the facts of a case required a unanimity instruction, rather than whether the statutory definition of the crime itself required a unanimity instruction in every case. The fact-specific rule is that no unanimity instruction is required where multiple

firearms charged in a single count were discovered as part of the same transaction. *See Sims*, 975 F.2d at 1240-41. A specific unanimity instruction is required only where "a genuine risk [exists] that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts." *Id.* at 1241 (citations and internal quotation marks omitted). DeJohn asks us to announce as a rule of law that the specific firearm possessed by a felon is a statutory element of 18 U.S.C. § 922(g)(1) such that the jury must be given a unanimity instruction each time multiple firearms comprise a single § 922(g)(1) charge, regardless of the facts of the case.

Only one circuit court has dealt at length with the question of whether *Richardson* requires unanimity as to which firearm was possessed. *See United States v. Verrecchia*, 196 F.3d 294, 298-301 (1st Cir. 1999); *see also United States v. Drayton*, No. 02-4234, 2002 WL 31518834, *2 (4th Cir. Nov. 7, 2002) (rejecting similar claim without analysis but citing *Verrecchia*). *Verrecchia* involved a defendant who argued that the instructions to the jury deciding his case should have included a specific unanimity charge as to which firearms he possessed. The *Verrecchia* court decided that the particular firearm possessed by a defendant is a means and not an element of the crime of being a felon in possession. The court's analysis closely tracked *Richardson*, looking first to the language of the statute, emphasizing the phrase "*any* firearm" as the element of the crime, and possession of *a* firearm as a means to that element. The *Verrecchia* court then looked to other provisions of the statute and discussed the emphasis of these provisions on the categories of persons prohibited from possessing firearms rather than the type of firearm possessed. The court then considered legislative history, which demonstrated that Congress's emphasis was again "on the person, not the firearm." *Id.* at 300. The court determined that tradition, a factor used in *Richardson*, was unhelpful in the case at hand. The court concluded that potential unfairness was not an issue, as unlike in *Richardson*, a disagreement about which gun was possessed would not

mean that jurors believed the defendant to be guilty of different crimes of wildly varying seriousness. Finally, the *Verrecchia* court cited *Sims* and other pre-*Richardson* cases that dealt with whether jury unanimity was required as to which firearm was used or carried under 18 U.S.C. § 924(c). The court found that "no error, let alone plain error," occurred. *Id.* at 301.

DeJohn attempts to distinguish his case from *Verrecchia* on its facts, but that argument misunderstands the holdings both of *Richardson* and of *Verrecchia*. Whether the particular firearm is an element of § 922(g) is a question of statutory interpretation, not one to be decided with reference to the facts of each case. DeJohn also adverted at oral argument to the Supreme Court case *Castillo v. United States*, 530 U.S. 120 (2000), which involved a challenge to the determination by a judge, rather than a jury, that the defendant had carried a machinegun, a determination that carried the penalty of an additional twenty-five years in prison under 18 U.S.C. § 924(c)(1). In determining that the type of the firearm was an element of the crime rather than a sentencing factor, the Court noted that the basic crime under the statute was the use or carrying of a firearm itself, rather than an underlying crime of violence, making the traditional notion of the firearm itself as "means" unhelpful to the Court's analysis. *Id.* at 126. *Castillo* is distinguishable, however, because it dealt with a statutory provision that imposed a much steeper penalty, which both indicates an intention on the part of Congress to make the triggering fact an element of the crime and raises greater constitutional concerns if a judge rather than a jury is allowed to make that determination.

We are convinced by *Verrecchia*'s careful analysis of the statute, and we hold accordingly that the particular firearm possessed is not an element of the crime under § 922(g), but instead the means used to satisfy the element of "any firearm." Therefore, the district court did not commit plain error in failing to give an instruction to the jury requiring unanimity as to which of the firearms DeJohn possessed. We

emphasize, however, that this does not in any way alter the holding of *Sims*; when the particular factual circumstances create "a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts," a jury unanimity instruction is still required. *Sims*, 975 F.2d at 1241 (citations and internal quotation marks omitted). We hold today only that, as a matter of statutory interpretation, such an instruction need not be given in every case under § 922(g).

## C. Harb's Remaining Claims of Error

Harb claims that the district court erred in admitting into evidence tape recordings without the requisite foundation; that the evidence was insufficient as to Count Twenty-Six, conspiracy to distribute cocaine, Counts Five, Six, Thirteen, Seventeen through Twenty-Two, Twenty-Four, and Twenty-Five, use of a communication facility to facilitate the marijuana conspiracy, and Counts Twenty-Nine and Thirty, use of a communication facility to facilitate the cocaine conspiracy; that the asserted variance between a single cocaine conspiracy charged in the indictment and the multiple cocaine conspiracies shown at trial prejudiced Harb; and that the district court erred in its drug quantity determination at sentencing. Each of these contentions is without merit and will be dealt with briefly.

### 1. Foundation for Tape Recording Evidence

Harb argues that the tape recordings the government made from the wiretap on Laudato's cell phone had an inadequate foundation when they were introduced into evidence. Harb objected at trial, so we will review the district court's admission of the tape recordings for abuse of discretion. *See United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983). Harb essentially argues that the testimony offered when all of the audio tapes were entered into evidence, that of FBI Agent Steven Vogt ("Vogt"), was inadequate to establish the accuracy and trustworthiness of the evidence. He makes no

argument that the tapes were in fact inaccurate. Vogt testified as to the court authorization to get the wiretaps, the taping by two simultaneous recording devices, and the monitoring of conversations and the log made and further testified that each tape played at trial was made by isolating a conversation on the original tapes and dubbing it onto a blank tape. While we have not in our prior cases indicated precisely what foundation is necessary to admit audiotapes where the challenge is to their admission generally, other circuits have alternately held that the district court must be satisfied that the recording is "'accurate, authentic, and generally trustworthy,'" *United States v. Panaro*, 266 F.3d 939, 951 (9th Cir. 2001) (citations omitted), that "simply required [is] proof that the tape recording accurately reflects the conversation in question," *United States v. Doyon*, 194 F.3d 207, 212 (1st Cir. 1999), or that "a proper foundation . . . may be established in two ways: a chain of custody . . . or alternatively, other testimony could be used to establish the accuracy and trustworthiness of the evidence." *United States v. Rivera*, 153 F.3d 809, 812 (7th Cir. 1998). In addition to Vogt's testimony, the district court also required that a foundation be laid for each individual recording before it was played for the jury. Given the cumulative effect of Vogt's testimony and the other witnesses' authentication of each audiotape, it was not an abuse of discretion for the district court to admit the tapes. *Cf. United States v. Carbone*, 798 F.2d 21, 25 (1st Cir. 1986) (allowing authentication through testimony of agents as to how recorders worked and testimony of participants in each conversation).

## 2. Sufficiency of the Evidence

This court reviews a claim of insufficient evidence to determine whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). All credibility determinations are drawn in favor of the prosecution. *United States v. Avery*, 128 F.3d 966, 971

(6th Cir. 1997). Harb challenges the sufficiency of the evidence on all of the counts of using a communication facility to facilitate acts constituting a felony, namely the cocaine and marijuana conspiracies, and on the count of conspiring to distribute and to attempt to distribute cocaine. In making this argument, Harb basically disregards the extensive testimony of Laudato and relies instead upon his own testimony to bolster his argument — which makes this a credibility determination rather than a sufficiency problem. *See, e.g.*, Appellant Harb's Br. at 25 ("[I]n fact no proof was offered that *any* cocaine was ever bought, sold, delivered or, for that matter, even existed, *other than the testimony of Mr. Harb and Laudato*." (second emphasis added)).

Harb makes a slightly more sophisticated argument with respect to each of the conversations, contending that they did not "facilitate" a conspiracy to distribute. While this does not merit discussion with regard to the conversations directly regarding the sale of marijuana that Harb was making to Laudato in amounts clearly intended for redistribution, it bears more parsing out with regard to the cocaine conspiracy. Harb's argument is essentially that he was a customer, not a coconspirator, and he points to cases rejecting the idea that a mere purchaser can be convicted as a coconspirator. He also argues with respect to the telephone conversations that even if the evidence supports an underlying conspiracy, the calls themselves did not facilitate the conspiracy. But Harb was clearly conspiring with Laudato in that he knew who Laudato's supplier was (referring at one point to "your friend out in Mentor," J.A. at 234), gave messages to Laudato to give to Laudato's supplier in hopes of facilitating transactions, and was himself reselling cocaine and informing Laudato of that fact by phone in an attempt to use his customers' willingness to pay in order to get the cocaine from Laudato's supplier sooner. Laudato had had difficultly in getting cocaine from his supplier for quite some time at this point, a fact of which Harb was aware. Additionally, the amount of cocaine Harb was receiving from Laudato can also help in this case to show his knowledge of a wider-ranging

conspiracy necessary for him to receive the drugs. *See United States v. Warner,* 690 F.2d 545, 551 n.10 (6th Cir. 1982); *United States v. Grunsfeld*, 558 F.2d 1231, 1235 (6th Cir.), *cert. denied*, 434 U.S. 872 (1977). Laudato testified that he sold cocaine to Harb four to six times, at quantities ranging from one to nine ounces; one of the phone conversations recorded between Laudato and Harb was decoded by Laudato as referring to eighteen ounces of cocaine. Harb's challenge to the sufficiency of the evidence fails.

### 3. Single vs. Multiple Conspiracies

Harb complains that the indictment charges a single conspiracy between him, Laudato, and "persons known or unknown," but the proof at trial included proof of a much larger conspiracy including all of Laudato's suppliers and their suppliers. Harb asserts that he was unable to question the existence of the larger conspiracy, and that guilt by association with Laudato operated to his substantial prejudice. Harb does not make clear what he felt the district judge should have done differently — whether he is challenging the inclusion of this evidence at trial or the jury instructions — but the government treats this assignment of error as a request for a multiple-conspiracy jury instruction, a common claim. While Harb suggests this is "a question of fact and is to [be] considered on appeal in the light most favorable to the government," and that "reversal is required where substantial rights are involved," Appellant Harb's Br. at 30, the government suggests that this is a jury-instruction claim, to be reviewed for plain error in the absence of an objection by Harb. Inasmuch as Harb simply contends he was not part of a larger conspiracy, he essentially repeats his sufficiency-of-the-evidence claim, which fails for the reasons noted above; he does not point to specific testimony which was prejudicial to his case, and that part of his claim should fail. Treating his claim as one for a jury instruction, as the government does, is equally unavailing. This was a simple chain-distribution conspiracy, in which Harb's not knowing who his ultimate suppliers were is irrelevant. *See Warner*, 690 F.2d at 549

("Because the success of participants on each level of distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants.").

### 4. Quantity Determination

Harb challenges the district court's determination at sentencing of the quantity of forty-five pounds of marijuana. "We review de novo the sentencing court's interpretation of the Sentencing Guidelines and statutes, and we review for clear error its factual findings. If the district court's factual findings are not clearly erroneous, this court reviews de novo the determination that the conduct in question constituted relevant conduct." *United States v. Corrado*, 304 F.3d 593, 607 (6th Cir. 2002) (citations and internal quotation marks omitted). Laudato testified that he had received between sixty and eighty pounds of marijuana from Harb and that a phone conversation between him and Harb regarding "forty-seven jobs" was in fact a reference to forty-seven pounds of marijuana. J.A. at 239, 363-65. This assignment of error is without merit.

### D. DeJohn's Remaining Claims of Error

DeJohn additionally claims that his indictment on the felon-in-possession charge was the result of prosecutorial vindictiveness, that there was insufficient evidence to support his felon-in-possession conviction, that the district court was in error in failing to instruct the jury on innocent possession of weapons, that the district court's determination of drug quantity at sentencing was an *Apprendi* error, that the drug quantity determination was in any case in error, that the district court improperly believed itself unable to grant a downward departure for role in the offense, that the district court erred in not granting a downward adjustment for acceptance of responsibility, that it erred in granting an enhancement for obstruction of justice, that prosecutorial

misconduct deprived DeJohn of due process, and that DeJohn received ineffective assistance of counsel at trial. Each of these contentions is without merit or unripe and will be dealt with briefly.

### 1. Prosecutorial Vindictiveness

The original indictment did not charge DeJohn with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), but after plea negotiations failed, in which the allegation was used as a bargaining chip, the charge was added to the indictment on which DeJohn was ultimately tried. DeJohn asserts that this charge was added due to prosecutorial vindictiveness based on his assertion of his right to go to trial. This claim is effectively foreclosed by *Bordenkircher v. Hayes*, 434 U.S. 357, 363-65 (1978), in which the Supreme Court held in a similar situation that "in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." *Id.* at 363. This circuit has consistently indicated that when the right asserted by the defendant is simply the right to go to trial, an additional charge entered after a failed plea bargain cannot, after *Hayes*, form the substance of a viable vindictive prosecution claim. *See United States v. Walls*, 293 F.3d 959, 970 (6th Cir.), *cert. denied*, 537 U.S. 1022 (2002); *United States v. Suarez*, 263 F.3d 468, 479-80 (6th Cir. 2001), *cert. denied*, 535 U.S. 991 (2002); *United States v. Andrews*, 633 F.2d 449, 456 (6th Cir. 1980) (en banc), *cert. denied*, 450 U.S. 927 (1981). This claim fails.

### 2. Additional Challenges to Felon-in-Possession Charge

In addition to the unanimity argument dealt with above, DeJohn makes two additional arguments attacking his felon-in-possession charge. He asserts that the evidence was insufficient to support a conviction on this count and that he was entitled to an instruction on innocent possession of firearms. Both claims fail.

This court reviews a claim of insufficient evidence to determine whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Avery*, 128 F.3d at 971 (citations and internal quotation marks omitted). "Actual or constructive possession is sufficient to give rise to criminal liability under § 922(g). Both actual and constructive possession may be proved by circumstantial evidence." *United States v. Schreane*, 331 F.3d 548, 560 (6th Cir.), *cert. denied,* 124 S. Ct. 448 (2003) (citations and internal quotation marks omitted). The firearms were found in DeJohn's residence, which he shared only with his wife, and he knew precisely where they were when asked by a law-enforcement agent. There is sufficient evidence from which the jury could have concluded that DeJohn had constructive possession of the guns, even without disregarding the testimony he presented as to their ownership by third parties. *See United States v. Clemis*, 11 F.3d 597, 601 (6th Cir. 1993), *cert. denied*, 511 U.S. 1094 (1994).

DeJohn next argues that the district court erred in not giving an innocent-possession instruction to the jury. Since he failed to object, this omission is reviewed for plain error. *See Sims*, 975 F.2d at 1240. Innocent possession is a very narrow defense to § 922(g), requiring the defendant to show that he or another was under an unlawful and imminent threat of death or serious bodily injury, that he had not placed himself recklessly in that situation, that he had no reasonable alternative to violating the law, that a direct causal relationship existed between possessing the firearm and avoiding the threat, and that he did not maintain the illegal conduct any longer than necessary. *See United States v. Newcomb,* 6 F.3d 1129, 1134-36 (6th Cir. 1993); *United States v. Singleton*, 902 F.2d 471, 472-73 (6th Cir.), *cert. denied*, 498 U.S. 872 (1990). DeJohn has not alleged that *any* of these factors exists in this case in any of the evidence he has presented; the district court did not err in failing to instruct the jury on innocent possession.

**3. Sentencing**

DeJohn makes five claims of error regarding his sentencing by the district court. "We review de novo the sentencing court's interpretation of the Sentencing Guidelines and statutes, and we review for clear error its factual findings. If the district court's factual findings are not clearly erroneous, this court reviews de novo the determination that the conduct in question constituted relevant conduct." *Corrado*, 304 F.3d at 607 (citations and internal quotation marks omitted).

**a. Drug-Quantity Determination**

DeJohn argues that the district court's determination of the drug quantity attributable to him was unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). DeJohn's *Apprendi* argument is entirely foreclosed by *United States v. Lawrence*, 308 F.3d 623, 634-35 (6th Cir. 2002), which squarely rejected an identical argument. DeJohn attempts to distinguish *Lawrence* on the facts, but this attempt is entirely unpersuasive, as *Lawrence*'s holding is in no way factbound, and is foursquare on the law: *Apprendi* does not apply to Guidelines determinations, only statutory maximums, and *Apprendi* does not govern increases in statutory minimum sentences. *Id.*

DeJohn additionally argues that the jury found him responsible for only one pound of marijuana and the district court therefore erred in finding him responsible for forty-five pounds. Even if we were to accept DeJohn's characterization of the jury's verdict, his argument that the judge is bound by the jury's factfinding in sentencing has been clearly rejected. *See United States v. Watts*, 519 U.S. 148, 149 (1997). The district court in this case made the same quantity determination as to both defendants, addressing the alleged inconsistency of that determination with the jury verdict, and came to the reasonable conclusion based on the evidence that DeJohn had been involved in a conspiracy to distribute forty-five pounds of marijuana. The government introduced

wiretap tapes of Harb and Laudato having a conversation about "forty-seven jobs," which Laudato testified referred to forty-seven pounds of marijuana; an hour after that conversation, Laudato in a second taped conversation related to DeJohn that forty-five pounds were available. Laudato testified that he was attempting to facilitate the sale of the marijuana to DeJohn, and the taped conversations reveal that DeJohn was in turn attempting to sell the marijuana to a third party, who ultimately wouldn't "do it at that number [i.e., price]." J.A. at 235-42, 356-57, 362-67. This was sufficient evidence from which the district court could reach the quantity determination of forty-five pounds.

**b. Downward Departure for Role in the Offense**

DeJohn contends that the district court erred in believing that it did not possess the authority to make a downward departure for his role in the offense, which is the only condition under which this court can review the refusal to grant a downward departure. *See United States v. Walls*, 293 F.3d 959, 969 (6th Cir.), *cert. denied*, 537 U.S. 1022 (2002). The district court in no way indicated that it did not have the authority to grant a downward departure, and in fact granted a downward departure for perceived double-counting on DeJohn's sentence. This claim was not raised below, and in any case, a mere disparity between the sentences of codefendants, without more, does not justify a downward departure. *See United States v. Parker*, 912 F.2d 156, 158 (6th Cir. 1990). Additionally, the length of DeJohn's sentence has everything to do with his significant criminal history (two violent assault convictions) and the felon-in-possession charges, and little to do with the drug conspiracy (which increased his overall offense level by only one level). This claim of error is without merit.

### c.  Denial of Downward Adjustment for Acceptance of Responsibility

As DeJohn pleaded not guilty and went to trial and the district court found that he perjured himself on the stand at trial, a finding strongly supported by the record, DeJohn's argument that the district court committed error in not applying a downward adjustment for acceptance of responsibility is meritless.  DeJohn makes the creative argument that he is entitled to this adjustment despite his refusal to admit his guilt of specific, convicted acts.  He is not.  *See* U.S.S.G. § 3E1.1 Application Note 1(a) (in determining whether a defendant has accepted responsibility, relevant consideration is whether defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction").

### d.  Enhancement for Obstruction of Justice

DeJohn objects to the district court's enhancement of his sentence based on obstruction of justice under U.S.S.G. § 3C1.1.  The district court made careful, detailed findings of exactly when DeJohn had committed perjury, noting specifically that DeJohn had "stated under oath that he had never distributed drugs." J.A. at 774.  The district court went on to say that not only had the jury found that statement to be "incredible," but the court itself found it incredible. *Id.*  This is borne out by the portions of DeJohn's testimony regarding the taped conversations that he had with Laudato, where he claims that clear references to third parties who are interested in purchasing marijuana from DeJohn are references to himself.  DeJohn argues that his perjury was insufficiently material to support an obstruction-of-justice enhancement; it is hard to imagine a perjurious statement more material to a conviction for conspiracy to distribute drugs than one claiming never to have distributed drugs.  This argument also fails.  *See* U.S.S.G. § 3C1.1 Application Note 4(b) (adjustment applies to "committing . . . perjury").

### 4.  Prosecutorial Misconduct

DeJohn argues that the prosecutor committed misconduct by arguing facts not in evidence, specifically arguing that the amount of marijuana found at DeJohn's home was not for personal use, and stating that the triple-beam scale found at DeJohn's house was of a type used by drug dealers.  In determining whether a prosecutor's inappropriate statements warrant reversal, we apply the two-step test elaborated in *United States v. Leon,* 534 F.2d 667, 678-83 (6th Cir. 1976), and *United States v. Bess*, 593 F.2d 749, 753-57 (6th Cir. 1979).  *See United States v. Carroll*, 26 F.3d 1380, 1384-87 (6th Cir. 1994) (collecting and explaining cases).  "[F]irst, we determine whether a prosecutor's remarks were improper, and then we determine whether the impropriety amounts to reversible error." *Carroll*, 26 F.3d at 1385.  In determining whether reversal is necessary, we look to four factors: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Id.*  The prosecutor argued that the 7.99 pounds of marijuana found at DeJohn's home, at the $1800 per pound that DeJohn testified he paid for marijuana, was over $10,000 worth of marijuana and therefore not for personal use.  This argument depends upon facts reasonably in evidence and simply makes an inference from those facts; this is not improper.  Inasmuch as the prosecutor's description of the triple-beam scale as an accessory of drug dealers might be considered a fact not properly in evidence, and inasmuch as it might tend to prejudice the accused, it was a single remark, and the evidence against DeJohn is quite strong.  This claim of error fails.

### 5.  Ineffective Assistance of Counsel

DeJohn asserts ineffective assistance of counsel with regard to his lawyer's failure to ask for a unanimity instruction and to object to the alleged prosecutorial misconduct.  Normally,

an appellate court does not consider ineffectiveness of counsel on direct appeal, as the record of a defendant's counsel's performance is not fully developed, and we therefore decline to decide this issue. *See United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995), *cert. denied*, 516 U.S. 1136 (1996); *see also Massaro v. United States*, 538 U.S. 500, 504 (2003) ("In light of the way our system has developed, in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance.").

### III. CONCLUSION

We therefore **AFFIRM** the convictions and sentences of Harb and DeJohn.

### CONCURRENCE

RYAN, Circuit Judge, concurring. While the defendants have sent up a considerable number of issues in these appeals, there are only two, as the majority opinion correctly recognizes, that have even arguable merit. The first is the claim made by both defendants that they suffered a violation of the Speedy Trial Act, and the second is DeJohn's claim that a specific unanimity jury instruction was required for his felon-in-possession charge. While I agree with my colleagues' analysis with respect to the jury instruction issue and with their *conclusion* that there was no violation of the Speedy Trial Act, my analysis of the latter issue differs considerably from theirs.

After a close examination of the language of Sections 3161(b) and 3162(a)(1) and the decisions of this and other circuits construing those sections, I am satisfied that there was no violation of the Speedy Trial Act because, and solely because, there was no arrest within the meaning of Section 3161(b) to trigger the 30-day pre-indictment clock. *United States v. Graef*, 31 F.3d 362, 364 (6th Cir. 1994); *see also United States v. Salgado*, 250 F.3d 438, 454 (6th Cir. 2001); *United States v. Mills*, 964 F.2d 1186, 1189 (D.C. Cir. 1992) (*en banc*) (collecting cases); *United States v. Summers*, 894 F.2d 90, 91 (4th Cir. 1990); *United States v. Alfarano*, 706 F.2d 739, 741 (6th Cir. 1983) (*per curiam*).

For the foregoing reasons, I am pleased to concur in the court's judgments of affirmance in these two cases.